G. Michael Jackson, State Bar No. 139384
**JONES, DAVIS & JACKSON, PC**
25350 Magic Mountain Parkway, Suite 300
Valencia, CA 91355
Telephone: (661) 481-2220
Facsimile:  (661) 836-7711
Email: mjackson@jonesdavis.com

Attorneys for Plaintiff Pamela DuMond

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PAMELA DUMOND, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>FARRAH REILLY, a/k/a EMMA CHASE, an individual; EMMA CHASE, LLC; and DIVERSION PUBLISHING CORPORATION, d/b/a EVERAFTER ROMANCE,<br><br>    Defendants. | Case No.: 2-19-cv-08922-GW-AGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Hearing Date:      April 9, 2020<br>Hearing Time:      8:30 a.m.<br>Place:                   Courtroom 9D |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Preliminary Statement ............................................................................. 1

II.   Summary of Defendant's Motion to Dismiss ........................................... 2

III.  Factual Background .................................................................................. 3

IV.   Synopses of the Work and the Copy ........................................................ 5

      A.    The Work....................................................................................... 5

      B.    The Copy ....................................................................................... 7

V.    Argument and Authorities ........................................................................ 9

      A.    Rule 12(b)(6) standard.................................................................. 9

      B.    The FAC sufficiently pleads a claim for copyright infringement ............... 10

      C.    While "substantial similarity" may be determined by the
            Court in a Motion to Dismiss, a Motion to Dismiss is not
            appropriate in this case due to the means of copying................... 12

            1.    A Motion to Dismiss is not appropriate in this case ....................... 12

            2.    Text Spinning...................................................................... 13

      D.    The Work and the Copy are substantially similar
            under the extrinsic test................................................................ 15

            1.    Plot .................................................................................. 15

            2.    Theme ............................................................................... 16

            3.    Dialogue ........................................................................... 17

            4.    Mood ................................................................................ 17

            5.    Setting .............................................................................. 18

            6.    Pace ................................................................................. 18

            7.    Characters ......................................................................... 19

            8.    Sequence of Events ............................................................. 20

VI.   Conclusion .............................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 4, 9

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1988).  .................................. 9

*Benay v. Warner Bros Entertainment, Inc.*, 607 F.2d 620 (9th Cir. 2010) ........................ 18

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir. 1996) ........................................ 9

*Campbell v. The Walt Disney Company,* 718 F.Supp.2d 1108 (N.D. Cal. 2010) ........... 18

*Christianson v. West Publishing Co.*, 149 F.2d 202 (9th Cir. 1945) ................................ 12

*Cline v. Reetz-Laiolo*, 329 F.Supp.3d 1000 (N.D. Cal. 2018) ........................................ 15

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*,
462 F.2d 1072 (9th Cir. 2006) ........................................................................ 11

*Hogan v. DC Comics*, 48 F.Supp.2d 298 (S.D.N.Y 1999) .................................................. 20

*Identity Arts v. Best Buy Enterprise Services, Inc.*,
No. C05-4656 (N.D. Cal. 2007) (2007 WL 1149155) ........................................ 16

*Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030 (9th Cir. 2000) ........................................ 10

*Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042 (9th Cir. 1994) ..................... 20

*Loomis v. Cornish*, 836 F.3d 991 (9th Cir. 2016) ................................................. 10

*Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002) ........................................ 15, 17, 20, 21

*Monaco v. Bear Stearns Companies, Inc.*, No. CV-0-05438 (C.D. Cal. Jan. 13, 2011)
(2011 WL 11027559) ........................................................................................ 10

*Moss v. United States Secret Service*, 572 F.3d 962 (9th Cir. 2009) .................................... 8

*Nirvana, LLC v. Mark Jacobs International, LLC*,
No. CV-18-10743 (C.D. Cal. Nov. 9, 2019) (2019 WL 7817082) .......................... 3, 11

*Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446 (9th Cir. 1988) ........................ 17

*Rice v. Fox Broadcasting Co.*, 148 F.Supp.2d 1029 (C.D. Cal. 2001) ............................. 19

*Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ................................................. 13

*Skidmore v. Led Zeppelin*, No. 16-56057
(9th Cir. Mar. 9, 2020) (2020 WL 1128808) ........................................................ 10, 13

*Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017) ........................ 11

*United States v. Ritchie,* 342 F.3d 903 (9th Cir. 2003) ...................................... 10

*Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977 (9th Cir. 2002) ............................ 9

*Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.,*
 216 F.2.d 945 (9th Cir. 1954) ....................................................................... 20

*Zella v. E.W. Scripps Co.*, 529 F.Supp2d 1124 (C.D. Cal. 2007).................................... 12

## Rules

FED. R. CIV. P. 8 ............................................................................................ 4

FED. R. CIV. P. 12 .................................................................................*passim*

## Other Authorities

Jonathan Bailey, A Brief History of Article Spinning, (March 18, 2018)
(www.plagiarismtoday.com/2018/03/08/a-brief-history-of-article-spinning/) ............... 13

JOHN ELDER, PHP PROGRAMMING FOR AFFILIATE MARKETERS (1st ed. 2012) ................ 13

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Preliminary Statement.

Plaintiff Pamela DuMond ("Ms. DuMond") filed this lawsuit to recover actual damages, statutory damages, attorneys' fees and costs against Defendants Farrah Reilly, a/k/a Emma Chase, an individual ("Ms. Chase"), Emma Chase, LLC ("EC"), and Diversion Publishing Corporation, d/b/a EverAfter Romance ("Diversion Publishing").

It is undisputed that Ms. DuMond is the author of Part-Time Princess, Ladies-in-Waiting:  Book One, first published in 2014 and assigned copyright registration number TX0008339989 by the United States Copyright Office in 2016 (the "Work").  It is further undisputed that Ms. Reilly and/or EC are the authors of Royally Screwed, first published in 2016 and assigned copyright registration number TX0008307167 by the United States Copyright Office in 2017 (the "Copy"), and that Diversion Publishing is the publisher of the Copy.

The Defendants have filed a perfunctory Motion to Dismiss Ms. DuMond's First Amended Complaint ("FAC"), which relies upon Rule 12(b)(6) of the Federal Rules of Civil Procedure, based upon the single argument that "Plaintiff's copyright claim fails because there is no substantial similarity of protected expression between the works at issue."  (Motion to Dismiss, p. 1 [*sic*]).

Defendants' Motion to Dismiss included a Request for Judicial Notice [Dkt. 28] that included paper copies of the two books – the Work and the Copy, as well as other documents. Romance novels are a billion dollar a year industry and romance readers are voracious.  While paper copies of many books are still available, paper copies of modern romance books are generally regarded as an old-fashioned media. E-books and audio books are the modern media for the romance genre.   In fact, a Google search of the Copy on goodreads.com points readers to Amazon, Audible, Walmart ebooks, Apple Books, Google Play and other providers of books in digital format (https://www.goodreads.com/book/29991719/get_a_copy).

As set forth below, the analysis relied upon by the Defendants in their Motion to Dismiss is antiquated.  The copying and copyright infringement of the Defendants was most likely the result of digital text spinning followed by a re-write and polish. Text spinning  -- also called automatic paraphrasing -- is performed by computer software containing a built-in thesaurus.[1]

While digital text spinning results in the alteration of the original work, it also results in nonsensical phrases, awkwardly constructed sentences,  patterns, repetitions, and other anomalies -- all of which exist in the Defendants' Copy.  What else could explain why the very unique word "Rome" occurs at exactly 67% of the way through the digital version of the Work and at exactly 65% of the way through the digital version of the Copy; and the very unique word "Beyoncé" occurs at exactly 95% of the way through the digital version of the Work and at exactly 95% of the way through the digital version of the Copy.  Defendants will argue that the exact same word placement is a remarkable coincidence or that the word is not a form of protected expression.

As detailed below, the digital versions of the Work and the Copy show similarities that are so striking as to preclude the possibility that Ms. DuMond and Defendant independently arrived at the same result.  The Appendix is replete with similarities that are similarly placed in the Work and the Copy.  This Court should employ a digital analysis of the Work and the Copy, rather than the antiquated paper analysis urged by the Defendants.

## II.    <u>Summary of the Defendants' Motion to Dismiss.</u>

Notably absent from the Defendants' Motion to Dismiss are statements like "we didn't copy Ms. DuMond's book."  Instead, Defendants advance a paradoxical argument that the two works are "strikingly dissimilar," while at the same time so similar that the works  both  rely  upon:    Cinderella's  rags  to  riches  story,  and  contain  "trivial

---

[1]    These programs spin sentences, replace or swap certain key words for other key words. This software is commonly used by students and writers to avoid plagiarism detection tools such as "Turnitin.com."

commonalities" like identical character names, brands, identical specific words, and "Marie Callendar's" a "Pie" brand decidedly uncommon to royal romance novels, and the like. (Motion, pp. 1-2). "However, '[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.'" *Nirvana, LLC v. Mark Jacobs International, LLC*, No. CV-18-10743 (C.D. Cal. Nov. 9, 2019) (2019 WL 7817082, at \*12) (citations omitted).  Despite this concession and judicial admission of these common elements, Defendants simply assert that the overwhelming number of common elements are not protectable.

In essence, Defendants argue in their Motion to Dismiss that if they copied the Work, the elements copied are not protectable under copyright law.  But the Work and the Copy share more than striking similarities in names, stock characters, or trope – they share hundreds of copyrighted elements including written dialogue, written plot points, written character traits, and written scenes, to name a few.[2]

Defendants' complaints concerning the FAC fail as a matter of a law and their Motion to Dismiss should be denied.  Alternatively, Ms. DuMond should be provided leave to amend to address any concerns, because amendment of the FAC would not be futile.  Ms. DuMond is entitled to her day in court to obtain justice from those responsible for unlawfully copying the Work.

## III.   Factual Background.

1.   Ms. DuMond is the author the Work.  (FAC ¶ 2).

2.   Ms. Reilly and/or EC are the authors of the Copy.  (FAC ¶ 3).

3.   The Work was first published in 2014, and the Copy was first published in 2016.  (FAC ¶¶ 2 , 3).

///

---

[2]      In the Copy's "Acknowledgments" Ms. Reilly wrote in part, "[i]t's not always easy coming up with a new story idea. . . But sometimes, inspiration takes a holiday, leaving a writer to flounder with the question: What am I going to do next?. . . ."

4.      Many of the sales of Ms. DuMond's book, including the Work, occur on the internet via websites such as Amazon.com, Audible.com, Applebooks.com, Kobo.com, BarnesandNoble.com, Walmart eBooks and Google Play, and therefore, are readily available to the public, including Defendants.  (FAC ¶ 10).

5.      Ms. Reilly and EC copied the Work and made the Copy and Diversion Publishing published and distributed the Copy.  (FAC ¶ 12).

6.      The notable similarities between the Work and the Copy go far beyond coincidental likeness or standard elements in the romance genre.   Rather, the magnitude of the similarities reveals an obvious and intentional misappropriation of the Work, and an attempt to pattern the Copy after the Work in multiple respects.  (FAC ¶ 13).

7.      Among the elements[3] of the Work copied in the Copy are the following:

| Element | Work | Copy |
|---|---|---|
| Hero | Prince Nicholas Frederick Timmel | Prince Nicholas Arthur Frederick Edward |
| Heroine / Villainess | Heroine: Lucy "Lucille" Trabbicio | Villainess: Lucy "Lucille" Deringer |
| Nicknames | "Lizzie" | "Livvy" |
| Good Friend | To Heroine, Lady Esmeralda | To Hero, Lady Esmerelda |
| Royal Guard | Tomas | Tommy |
| Handsome Man | Christoph | Christopher |
| Name of Bar | The MadDog Bar | The Horny Goat Pub |
| Penthouse Character | Owner: David Billingsley | Butler: David |
| Pie Reference | Marie Callender's | Marie Callender's |
| Famous References | Kardashian, Beyoncé, Brad Pitt, James Bond | Kardashian, Beyoncé, Brad Pitt, James Bond |

[3]      Defendants seem to take issue that the examples listed in the FAC is not a comprehensive list. *See* Motion, p. 1, n.1.  Defendants' contention is contrary to Rule 8 of the Federal Rules of Civil Procedure which requires only a "short and plain statement of the claim," not a comprehensive listing of all indicia of copyright infringement.  In addition, the challenged complaint is not required to contain "'detailed factual allegations' but must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  *See infra* Section VII.  Nevertheless, additional elements copied from the Work are set forth in the Appendix filed concurrently herewith as Exhibit "D."

| Element | Work | Copy |
|---|---|---|
| Words on one page | penthouse, hand-painted, crystal, marble floor | penthouse, hand-painted, crystal, marble floors |
| Chapter 3 Passage | Pies, shop, open, chocolate, berries, counter | Pies, shops, opens, chocolate, berry, counter |
| Linda Blair Reference | "swiveled his head toward me like Linda Blair" | "Linda Blair Exorcist-head-spinning" |
| Lucille Ball Reference | Lucy suspects she is named after Lucille Ball | "Mrs. McGillacutty" Ball's character maiden name |
| Heroine Statement | "I don't want to be a prostitute . . . ." | "Because I'm not a prostitute." |

(FAC ¶ 14).

## IV.   Synopses of The Work and the Copy.

Detailed Synopses of the Work and the Copy are set forth in Exhibit "C." The basic storylines from the Work and the Copy appear below.

### A.   The Work

LUCY – the Heroine -- is a broke, hard-working, twenty-something brunette WAITRESS at the MADDOG bar in Chicago.  She goes to school taking college classes and pays all the family's bills because her UNCLE had a psychological breakdown after LUCY'S parents died in a motorcycle accident. But Lucy's fired from her job when she pours a pitcher of margaritas on an entitled drunk young man's head when he harasses her and her BFF.

Lucy scans want ads and takes a job – supposedly that will only last the summer -- impersonating "Lady Elizabeth." Lucy is tasked with keeping Prince Cristoph in check until Elizabeth can return to the fictitious EUROPEAN country of FREDONIA. Elizabeth is entering into a business arrangement, a marriage of convenience to Prince Cristoph. But won't people know Lucy isn't Elizabeth? No – Elizabeth hasn't been back to Fredonia in fifteen months. Lucy later learns that the arranged marriage is necessary for the economic good of the royal family and to keep the citizens of Fredonia happy.

///

Lucy's job entails etiquette lessons and makeovers and eventually traveling to Fredonia. It's on the plane in Chicago that she meets NICHOLAS, the Hero a handsome, twenty-something brunette man. He takes the seat next to Lucy and hits on her immediately. Heroine finds out later that the hero is actually PRINCE NICHOLAS of Fredonia.  NICHOLAS thinks Lucy is Elizabeth and calls Heroine by the nickname "LIZZIE."  They play games, get to know each other better. Nick's a bit cocky, funny, outspoken. Their chemistry is off the charts.

Prince Cristoph greets Nick and Lizzie on the tarmac upon their arrival to Fredonia. Cristoph proposes marriage to LUCY and she passes out.  LUCY wakes in a hospital room and is examined for a concussion and meets a bevy of young royal Ladies including: Joan Brady a red-head who works as a BARRISTER and LADY ESMERALDA – who is flamboyant and loud. Heroine feels like she is in a "James Bond villain's lair."

At DAVID Billingsley's (Lizzie's Dad) luxurious PENTHOUSE, LUCY meets Helga the maid, a/k/a  "chief COOK and bottle washer" who has a thick accent and has been working with LIZZIE'S family since she was a teenager. Unsure of the lay of the land, Lucy asks which room is hers. Helga tells her that the "red" bedroom will always be hers.

PRINCE NICHOLAS tracks down LUCY at a park and offers her a chance to be his mistress and kisses LUCY for the first time. "Holy spitoli this guy was the best kisser." LUCY turns PRINCE NICHOLAS down because she must do her job.  She agrees to marry Cristoph as part of 'holding the fort' until Elizabeth can return.

Lucy and Prince Nick are already falling for each other but Lucy can't fall for Nick – this is a job. She has to get things done, has to keep her Uncle in Assisted Living. At a party, LUCY wanders around and is homesick. She misses being a waitress and contacts her BFF back at home.  LUCY avoids Cristoph's romantic advances. But when she finds Cristoph in bed with another woman – who we later discover she is Helga's daughter -- she's irritated. LUCY returns to the Penthouse where Helga/Crazy Maid is on the Penthouse balcony and tries harm/murder her.  PRINCE NICHOLAS attempts to subdue

Crazy Maid, but she escapes.

PRINCE NICHOLAS and LUCY travel to a distant chateau where they cement their romance, profess their love and make love. LUCY is tempted to tell PRINCE NICHOLAS that she's not really LIZZY and asks him why she shouldn't marry his brother. PRINCE NICHOLAS says duty to his country must come first.

Lucy flees to a chapel to try and figure out what to do. There she discovers that Elizabeth isn't returning to Fredonia. The Ladies in Waiting implore her to stay and marry Cristoph. Lucy could have the best of both worlds – a financially carefree life married to Cristoph and Nicholas could be her lover on the side. That is the royal way. Lucy's torn. Should she stay. Leave?

She decides to stay. But on her wedding day to Cristoph, LUCY has a change of heart and confesses to the crowd that she is not LIZZY nor can she marry Cristoph. LUCY abandons her royal wedding and returns to Chicago.  She returns to waitressing at the MADDOG bar.  PRINCE NICHOLAS shows up at the MADDOG bar, declares his love and proposes to LUCY. She accepts. Maybe fairytales really do come true.   THE END.

**B.**   <u>**The Copy**</u>

PRINCE NICHOLAS, the Hero, is a handsome young, twenty-something brunette man.  Queen Leonora, the Hero's grandmother, informs him that he must marry soon for the economic and emotional good of the country – an arranged marriage.  PRINCE NICHOLAS must go to New York City and bring his brother, Prince Henry, home.  Prince Henry hasn't been back to the fictitious EUROPEAN country of WESSCO in two years. PRINCE NICHOLAS and his best friend, Earl Simon BARRISTER a copperhead who works at/owns BARRISTER'S Department Store, drink and go to the HORNY GOAT pub.

Olivia HAMMOND, the Heroine, nicknamed "LIVVY" is a young, pretty, American commoner from New York.  LIVVY is a broke, hard-working, brunette, twenty-something WAITRESS and baker at AMELIA'S New York City coffee shop that has pies.  LIVVY has to pay all the family bills because her father had a psychological

breakdown after her mother died in a mugging.

Simon and PRINCE NICHOLAS arrive at Amelia's coffee shop where PRINCE NICHOLAS hits on LIVVY immediately, harassing her. She smashes a pie in his face. LIVVY finds out later that PRINCE NICHOLAS is royalty.  PRINCE NICHOLAS and LIVVY eventually go on a date. She even dresses him in a disguise and takes him out but when a woman spots him and remarks how much he resembles Prince Nicholas – Olivia says Nicholas could be a 'Prince Impersonator.'

The Queen orders PRINCE NICHOLAS, LIVVY and Prince Henry back to WESSCO.  Nicholas asks her to accompany him but only for the summer. LIVVY says a tearful farewell to family/friends in New York City.  They arrive in Wessco, Prince Nicholas has Olivia taken to the "white bedroom" and later remarks that the white bedroom will always be hers. In the castle, LIVVY meets "COOK, who worked at Guthrie House since my father was a lad."  Cook speaks in a thick brogue.

LIVVY gets a makeover.  LIVVY meets PRINCE NICHOLAS' friend, LADY ESMERELDA, who is flamboyant and loud and Lady LUCILLE "LUCY" Deringer.  At a party, LIVVY wanders around and is homesick. LIVVY misses being a waitress and contacts her BFF back at home.  LIVVY gets upset when she spots PRINCE NICHOLAS talking to LUCY.

Prince Henry falls off a yacht, hits his head, and is taken to a hospital room examined for a concussion.  At a polo match, a sleazy royal man asks about LIVVY. PRINCE NICHOLAS talks crassly about LIVVY.  LIVVY is upset and threatens to go home to New York.  But they make up. He asks her for the second time to stay in Wessco. He will enter into an arranged marriage with another woman but Olivia could stay in Wessco and be his mistress. She finally agrees. But someone has given a tabloid some dirty on Prince Nicholas. Palace people accuse LIVVY of selling out PRINCE NICHOLAS for money. PRINCE NICHOLAS and LIVVY argue. Palace people give LIVVY a plane ticket to New York and she leaves.

///

PRINCE NICHOLAS gets drunk.   PRINCE NICHOLAS confesses to the assembled crowd that he will marry LIVVY or no one.  PRINCE NICHOLAS abandons his royal profession, abdicates, and races back to New York.  PRINCE NICHOLAS finds LIVVY and declares his love for her at the coffee shop.  In the EPILOGUE, PRINCE NICHOLAS and LIVVY get married in WESSCO. THE END.

## V.   **Argument and Authorities.**

### A.   **Rule 12(b)(6) standard.**

In reviewing a Rule 12(b)(6) motion, a court must accept all factual allegations set forth in the challenged complaint as true, and construe and all draw all reasonable inferences in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co*., 80 F.3d 336, 337-38 (9th Cir. 1996).  A Rule 12(b)(6) motion may be granted only after the court finds either the "lack of a cognizable legal theory," or the "absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dept*., 901 F.2d 696, 699 (9th Cir. 1988).

As noted above, the challenged complaint is not required to contain "detailed factual allegations' but must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678 (citation omitted).  "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Twombly*, 550 U.S. at 555).[4]

///

---

[4]      Despite numerous implications in the Motion to Dismiss, Defendants cite no authority, because none exists, that a plaintiff in a copyright case must list each and every word, passage or other form of protectable expression that has been infringed upon.  If the Defendants were unable to ascertain the relief sought by the Plaintiff or understand the scope of the allegations, Defendants should have sought relief under Rule 12(e).

In considering a motion to dismiss under Rule 12(b)(6), the court normally looks at the complaint itself and any documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).   Under the incorporation by reference rule, a district court within the Ninth Circuit may review additional documents, referenced extensively in the complaint but not attached to the complaint, without causing the motion to dismiss to convert into a motion for summary judgment. *Id.* at 980 (citing *In re: Silicon Graphics, Inc. Sec. Litigation*, 183 F.3d 970, 986 (9th Cir. 1999); *see also United States v. Ritchie,* 342 F.3d 903, 907-08 (9th Cir. 2003); *Monaco v. Bear Stearns Companies, Inc.*, No. CV-0-05438-SJO (C.D. Cal. Jan. 13, 2011) (2011 WL 11027559, at \*1).

Ms. DuMond requests that the court take judicial notice of the documents filed concurrently herewith as Exhibits "A," "B," "C," and "D," under Rule 201 of the Federal Rules of Evidence.  Ms. DuMond relies upon the allegations in the FAC, as well as the following documents attached or referenced in the FAC:

Exhibit "A": Digital copy of <u>Part-Time Princess, Ladies-in-Waiting:  Book One</u>, formatted for Amazon Kindle's e-reader;

Exhibit "B": Digital copy of <u>Royally Screwed</u> formatted for Amazon Kindle's e-reader;

Exhibit "C": Detailed Synopses of the Work and the Copy; and

Exhibit "D": Appendix of comparison of digital versions of the Work and the Copy.

**B.     The FAC sufficiently pleads a claim for copyright infringement.**

A claim for copyright infringement has two elements:  (1) ownership of the copyright and (2) copying of protected elements by the defendant.  *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir. 2000) (citations omitted).  Because proof of direct copying is often difficult to obtain, copying can be shown with proof of:  (1) defendant's access to the work, and (2) substantial similarity between the works.  *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016).  Proof of access can be shown through widespread dissemination of the work.  *Id.* at 997 (citation omitted).  Here, access is shown because the FAC pleads widespread dissemination of the work via the internet

(FAC ¶ 10).[5]  As detailed below the Work and the Copy are substantially similar.

The crux of Defendants' argument is that the Work and the Copy lack sufficient similarity to make out a claim for copyright infringement.  "In assessing whether particular works are substantially similar, or strikingly similar, the Ninth Circuit applies a two-part analysis: the extrinsic test and the intrinsic test." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017).  Courts apply the extrinsic test, and the intrinsic test is for the jury.  *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.2d 1072, 1075 (9th Cir. 2006).

> Extrinsic analysis is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d 1157, 1164 (9th Cir. 1977). The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Kouf*, 16 F.3d at 1045 (citations omitted). In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).

*Id.*

Where Defendants cannot show the similarities between the Work and the Copy are insubstantial, the requirements of the extrinsic test are sufficiently satisfied.  *See Nirvana*, (2019 WL 7817082, at *12).  Under the two-part test for copyright infringement, there is overwhelmingly sufficient evidence of substantial similarity between the Work and the Copy.

///

---

[5]      In a very recent opinion, the Ninth Circuit overruled the "inverse ratio rule."  In so doing, the court held that even when access is widespread, a plaintiff must demonstrate that actual copying occurred.  The basis for the ruling was the "ubiquity of ways to access media online."  *Skidmore v. Led Zeppelin*, No. 16-56057 (9th Cir. Mar. 9, 2020) (2020 WL 1128808, at *15-16).  Here, even though access to the Work was widespread, Ms. DuMond has provided sufficient evidence of that of substantial similarity.

**C.  While "substantial similarity" may be determined by the Court in a Motion to Dismiss, a Motion to Dismiss is not appropriate in this case due to the means of copying.**

1. A Motion to Dismiss is Not Appropriate in This Case.

While this Court has the power to rule on the propriety of Ms. DuMond's copyright infringement claim in the context of a motion to dismiss under Rule 12(b)(6), *see e.g., Zella v. E.W. Scripps Co.*, 529 F.Supp2d 1124, 1130 (C.D. Cal. 2007),  the circumstances surrounding the infringement in this case mandate that the Motion to Dismiss be denied.

In the Ninth Circuit, a court's authority to review and rule upon a motion to dismiss a copyright claim traces back to *Christianson v. West Publishing Co.*, 149 F.2d 202 (9th Cir. 1945), a case that is now 75 years old.   Then, the Ninth Circuit held that, "[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss." *Id.* at 203 (citations omitted).  *Christianson* involved a copyright infringement claim involving two maps, not two books and certainly not the electronic versions of two books.   In *Christianson*, the two presumably single page maps were certainly capable of being examined by the court (likely in very quick order) and the court could rule on a motion to dismiss.

Here, rather than two single page maps, there are two books.  The paper copy of the Work is 328 pages. The paper copy of the Copy is 301 pages.  But paper copies use different fonts, book dimensions, etc.  A more accurate assessment would be that the Work contains approximately 79,000 words and 4030 Kindle Locations. The Copy contains approximately 82,000 words and 4340 Kindle Locations.[6]  However packaged, there is much more to consider with the Work and the Copy than the two maps in *Christianson*.

Moreover, Ms. DuMond asserts that the initial and predominant means of copying was likely "text spinning," a relatively new computer-based means of copying discussed in detail below.  As a result, Ms. DuMond asserts that this case is not appropriate for

---

[6] Kindle Location Description numbers are specific to each line of text.

consideration under Rule 12(b)(6).  Should either side seek the summary disposition of their claims or defenses, it should be done in a motion for summary judgment and only after discovery has taken place.  *Shaw v. Lindheim*, 919 F.2d 1353, 1354 (9th Cir. 1990) (in a copyright case, "summary judgment is appropriate if the court can conclude, <u>after viewing the evidence and drawing inferences</u> . . . .") (emphasis added).

In addition to routine discovery, it is anticipated that due to the overwhelming popularity of e-books that this newer nature of copying a novel will require expert testimony to provide analysis of the similarity of the Work to the Copy, as compared to the Work and a control novel.  This analysis will show the substantial individual similarities between the Work and the Copy, the distance between similarities in the Work and the Copy, and the clusters of similarities in the Work and the Copy.  The analysis will also show that the Work and the Copy are related to each other, and unlike any other two books in the world, contain unique similarities that occur in a similar order and at similar points of the works.  As recently noted by the Ninth Circuit, copyright analysis now occurs in "our digitally interconnected world." *Skidmore v. Led Zeppelin*, No. 16-56057 (9th Cir. Mar. 9, 2020) (2020 WL 1128808, at*15).  The analysis contained in the Motion to Dismiss is not applicable to the copyright infringement of the Defendants, and the means of copying utilized by the Defendants.

2.   <u>Text Spinning</u>.

"What is text spinning?  Spinning takes a set of words, sentence, or paragraphs and shuffles them based on some sort of pre-set criteria, usually randomly." JOHN ELDER, PHP PROGRAMMING FOR AFFILIATE MARKETERS (1st ed. 2012).[7]  Today, text spinning software is readily available on the internet at such sites as: www.spinbot.com, www.rewritertools.com,   www.spinnerchief.com   www.articlerewritertool.com,   and

---

[7]     Text spinning is also referred to as article spinning and is similarly defined.  "Article spinning is a technique to generate seemingly original content from old content by replacing words and phrases with synonyms."     Jonathan Bailey, <u>A Brief History of Article Spinning</u>, (March 18, 2018) (www.plagiarismtoday.com/2018/03/08/a-brief-history-of-article-spinning/).  Article spinning allows a computer to "automatically create thousands or even millions of permutations, each slightly different from the others." *Id.*

www.wordai.com.  With text spinning software, old words become new words, and one author's words can become another author's words:

Spinbot.com

- The quick brown fox jumped over the lazy dog.
- *The speedy dark colored fox hopped over the sluggish pooch.*

Rewritertools.com

- It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness, it was the epoch of belief, it was the epoch of incredulity, it was the season of light, it was the season of darkness, it was the spring of hope, it was the winter of despair.

- *It changed into the excellent of instances, it become the worst of instances, it turned into the age of expertise, it become the age of foolishness, it became the epoch of perception, it became the epoch of incredulity, it was the season of mild, it became the season of darkness, it was the spring of hope, it turned into the winter of depression.*

The Appendix (Exhibit "D") provides numerous examples of text spinning, evidencing the same or similar words appearing in close proximity in the same or similar locations in the Work and Copy.  As detailed below, the similarities, sequences and patterns resulting from text spinning can give rise to a finding of substantial similarity and copyright infringement.

> [T]he presence of so many generic similarities and the common patterns in which they arise do help the Metcalfs satisfy the extrinsic test. The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection.  A common "pattern [that] is sufficiently concrete . . . warrant[s] a finding of substantial similarity." *Shaw,* 919 F.2d at 1363; *see id.* ("Even if none of these [common] plot elements is remarkably unusual in and of itself, the fact that both [works] contain all of these similar events gives rise to a triable question

> of substantial similarity of protected expression."); *id.* (where main characters are both well dressed, wealthy, self-assured and have expensive tastes, "the totality of the [se] similarities . . . goes beyond the necessities of [defendants' work's] theme and belies any claim of literary accident").

*Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9ᵗʰ Cir. 2002).  *Metcalf* focuses on the totality of the similarities, not whether the similar items are subject to protection.  *Metcalf* cuts off the end-run that Defendants attempt to make that any similarities are merely genre specific.  At some point, as shown herein, similarities and patterns are no longer coincidental.

**D.  The Work and the Copy are substantially similar under the extrinsic test.**

1.  Plot

"'Plot' is defined as the 'sequence of events by which the author-expresses his theme or idea' that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works.'"  *Cline v. Reetz-Laiolo*, 329 F.Supp.3d 1000, 1039 (N.D. Cal. 2018) (citing *Zella*, 529 F.Supp.2d at 1135).

The plot of both the Work and the Copy are substantially similar based upon the concrete, objectively verifiable elements.

| The Work tells the story of Lucy a/k/a Lizzy, a waitress at the MadDog bar in a large American city (Chicago), who undergoes a series of romantic adventures starting when she meets Prince Nicholas in Chicago, continuing in the fictional European country of Fredonia, and ultimately getting engaged to Prince Nicholas | The Copy tells the story of Olivia a/k/a Livvy, a barista waitress at Amelia's Coffee Shop in a large American city (New York), who undergoes a series of romantic adventures starting when she meets Prince Nicholas in NYC, continuing in the fictional European country of Wessco, and ultimately marrying Prince Nicholas |
|---|---|

Same/similar plot points and scenes for the Work and the Copy are further noted in the Synopses above.  The Work's Heroine and the Copy's Hero/Heroine experience many scenes that fall in close sequence and proximity (as tracked by Kindle percentage noted in the digital books).  *See* Exhibit "D."

| |
|---|
| At the beginning of both books, Heroine/Hero reminisce about their lives including 'special reporters. |
| Heroine is broke. |
| Heroine is offered a lot of money by a Royal Man. |
| Heroine is at a Shop in the Work with the "the best fro-yo in Chicago" while Heroine is at a shop in the Copy with – "Pies?...The best in the city." |
| Young Woman helps Heroine pick underwear. |
| Heroine munches Cinnamon cereal while Hero comments. |
| Heroine tells Royal man that he should have told her about Prince's engagement. |
| Heroine meets Royal Grandmother for first time and 'freezes.' Hero tells Heroine his feelings for her have grown. |
| Heroine tries on clothes for royal event and it looks like something "exploded." |
| Heroine wanders off from royal party, is homesick, and contacts BFF back home. |
| Royals tell Heroine to "stay" in Prince's country. |
| Hero/Heroine 'flees' a royal ceremony abandoning royal 'job.' |
| Heroine returns to hometown and is sad. |
| Heroine returns to work at food-service place and BFF spouts off in Spanish. |
| Hero/Heroine's BFFs buy Heroine's place of employment and saves the financial day. |
| Prince professes his love for Heroine at her Employment. |
| 'Surprise party' reference at the exact same Location in both the Work and the Copy. |

2.  <u>Theme</u>

"Generally speaking, 'theme' can be defined as the subject or topic of artistic expression, a point of view embodied upon in a work of art, or even, as Identity Arts asserts, as the 'unifying or dominant idea' inherent in a given work. *Identity Arts v. Best Buy Enterprise Services, Inc.*, No. C05-4656-PJH (N.D. Cal. 2007) (2007 WL 1149155, at *3) (citations omitted).

Despite including "theme" in the section entitled "Theme and Mood" in the Defendant's Motion to Dismiss, theme is not directly addressed by the Defendants. Because so many other elements between the Work and the Copy are the same, the themes

are also the same.[8]

> Fish out of water - a royal prince dates a poor American commoner.
> The Heroine in the Work and the Hero in the Copy learn that no matter the expectations that others place upon you, you must stick-up for yourself and follow your heart, and a better life can be earned, and love can prevail.

3.   Dialogue

Text spinning has the ability to remove exact duplications of dialogue, yet similarities remain in the Work and the Copy.  *See supra*, V(C)(2), FAC ¶ 14 and Exhibits "C" and "D."  While Defendants contend that the similarities in dialogue are only brief phrases, it is the patterning and the placement of the dialogue that reveal its substantial similarity.  For instance:

| In the Work at  Chapter 26 (Kindle 68%): "Must hit the Ladies Room." "Whatever," Esmeralda said.…I said. "Back in a few. | In the Copy at Chapter 17 (Kindle 67%): "I have to head to the little lads' room."…"And Esmerelda spots… she says she'll "be back in a jiffy." |
|---|---|
| In the Work at Chapter 32, (Kindle 85%): "Don't leave Fredonia, Lucille. Stay." | In the Copy at Chapter 21 (Kindle 82%): "… "Don't go back to New York. Stay." |

4.   Mood

Mood of a work can seemingly be a number of different things – dramatic, comic, romantic, etc.  *See e.g. Olson v. National Broadcasting Co., Inc*., 855 F.2d 1446, 1450 (9th Cir. 1988).  In the Motion to Dismiss, Defendants point to the cover of the paper version of the Work that states it is a "Romantic Comedy," and therefore has a comic mood.  Once establishing the mood of the Work, Defendants then seek to distance the Copy from the Work by describing it as anything other than comic.[9]

---

[8]     Ms. DuMond does not contend these themes are protected areas of artistic expression.  The similarities are noted to show the wholesale copying done by the Defendants, and resulting pattern, as found by the court in *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).

[9]     Despite her statement about not writing romantic comedies, on www.goodreads.com, Ms. Chase's biography states:  "Emma Chase writes contemporary romance filled with heat, humor and heart."  www.goodreads.com/author/show/6551005.Emma_Chase?from_search=true

Defendants' efforts to run from the romantic comedy label are disingenuous. Amazon.com lists the Kindle version of the Work in two romance categories and one romantic comedy category.[10]   Amazon.com lists the Kindle version of the Copy in two romantic comedy categories and one romance category.[11]   The Work and the Copy are romantic comedies and romances, with substantially similar moods.

5.   Setting

The setting of the Work and the Copy are substantially similar.

| The Work takes place in Chicago (a large American city), and Fredonia (a fictional European country). | The Copy takes place in New York (a large American city), and Wessco (a fictional European City). |
|---|---|

The setting is not a scenes-a-faire, necessarily dictated by the underlying story.  The Copy could have been set anywhere – the story told in the Copy would not have changed at all if the heroine was from a small American farm town and traveled to Mexico and then returned to home.  Similarly, the heroine in the Copy could have worked at a grocery store in the small town because her place of employment was not plot dependent.  *C.f. Benay v. Warner Bros Entertainment, Inc.*, 607 F.2d 620, 627-28 (9th Cir. 2010) (holding that American war veteran who helped Japanese emperor with samurai uprising necessarily involved battle scenes in Japan).

6.   Pace

"The time period within which the [work] is set is a factor for determining the pace of the [work]." *Campbell v. The Walt Disney Company,* 718 F.Supp.2d 1108, 1115 (N.D. Cal. 2010) (citing *Capcom Co., Ltd. v. MKR Group, Inc.,* No. 08–0904–RS, (2008 WL 4661479, *10) (N.D.Cal. Oct. 20, 2008) (finding no substantial similarity in

---

[10]   https://www.amazon.com/Part-time-Princess-Royally-Romantic-Comedy-ebook/dp/B00M8LVW10/ref=tmm_kin_swatch_0?_encoding=UTF8&qid=1582849664&sr=8-1

[11]   https://www.amazon.com/Royally-Screwed-Book-1-ebook/dp/B01MEEICTH/ref=tmm_kin_swatch_0?_encoding=UTF8&qid=1582850638&sr=1-3

the pace of two works due partly to the fact that one story was completed within three days while the other took place over many months.) Another factor to consider in evaluating pace is the number of events that occur in the allotted time frame. *See Rice v. Fox Broadcasting Co.*, 148 F.Supp.2d 1029, 1058 (C.D. Cal. 2001).

Because the plot (*supra*), and the sequence of events (*infra*) are virtually identical and dictate the number of events that occurred over the course of the story, the pace of the Work and the Copy are substantially similar:

| The Work traces Lucy's travels from Chicago to Fredonia and back to Chicago in approximately 79,000 words and 4030 Kindle Locations. | The Copy traces Livvy's travels from New York to Wessco and back to New York, and finally back to Wessco in the epilogue, in approximately 82,000 words and 4340 Kindle Locations |
|---|---|
| The events in the Work transpire from Summer to the first week after Thanksgiving -- approximately five months. | The events in the Copy transpire over five months. |

7.   <u>Characters</u>

While Defendants are quick to note in the Motion to Dismiss that characters with identical names do not necessarily support a finding of substantial similarity, they fail to explain why the characters in the Work and the Copy with **<u>shockingly similar names</u>** are not substantially similar.  In the two novels, characters include:

| **<u>Prince Nicholas</u>**, the hero in the Work | **<u>Prince Nicholas</u>,** the hero in the Copy |
|---|---|
| **<u>Lucy</u>** Trabbicio a/k/a **<u>Lizzie</u>,** the heroine in the Work | **Olivia Hammond a/k/a <u>Livvy</u>,** the heroine in the Copy, and **<u>Lucy</u> Deringer**, the villainess in the Copy |
| **Lady Esmeralda** is a good friend to the heroine in the Work | **Lady Esmerelda** is a good friend to the hero in the Copy |
| **Tomas** is the royal guard in the Work | **Tommy** is the royal guard in the Copy |
| **David** is the penthouse owner in the Work | **David** is the penthouse butler in the Copy |

In response to the substantially similar character names, Defendants contend only that Ms. DuMond overstates the similarity of the names (Motion, p. 17, n. 9); however, it is more

plausible that Defendants slightly changed character names in a veiled attempt to avoid copyright infringement, the effect of "polishing" in the text-spinning method of infringement.

The Defendants grasp at the low-hanging fruit in the court's holding *Hogan v. DC Comics*, 48 F.Supp.2d 298, 311 (S.D.N.Y 1999), but fail to look beyond the identical names of the two characters.  In *Hogan*, the court does note that the two works both share a main character with an identical name, but the court also notes that the names are a "significant similarity."  *Id.*  Despite the name similarity, the court then goes on to highlight numerous differences in the characters, including how the characters interact with other characters.

Here, the foregoing names of the characters are beyond coincidence.  Of all the princes in the world that Defendants could have selected to play the hero, they chose "Prince Nicholas."  Ms. DuMond is aware that literary characters are afforded copyright protection only when the character "constitutes the story being told."  *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2.d 945, 950 (9th Cir. 1954).  However, even if the characters Ms. DuMond worked so hard to create are not subject to copyright protection, the wholesale appropriation of those characters by the Defendants again shows "the presence of so many generic similarities and the common patterns" to satisfy the extrinsic test.  *Metcalf*, 294 F.3d at 1074.

### 8.   Sequence of Events

In *Cline*, the court defined "plot" to necessarily include a "sequence of events."  329 F.Supp.3d at 1039 (citing *Zella*, 529 F.Supp.2d at 1135).  While similar to plot, sequence of events is identified as a separate element in the extrinsic test.  *See e.g., Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  The sequence of events is important because it can make generic, and otherwise unprotectable elements, protectable under copyright law.  Copyright protection is triggered because the generic similarities are not random, but patterned.

///

///

> In *Cavalier,* we did not address the protectability of the selection and sequence of generic elements. Plaintiffs argued unsuccessfully that the many "*random* similarities scattered throughout the works" satisfied the extrinsic test, No. 00–56192, slip op. at 7443 (emphasis added) (quoting *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984)), but apparently did not make an argument based on the <u>overall selection and sequencing</u> of these similarities. *See id.* at 7441.

*Metcalf*, 294 F.3d at 1074-75 (emphasis *original* and <u>added</u>).  Copyright infringement can "be based on original selection and arrangement of unprotected elements."  *Id.* at 1074 (citing *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446  (9th Cir.1994).

The sequence of events in the two works is essentially identical. The heroine travels from a large city in America to a fictional country in Europe, and later, the heroine returns alone to the large city in America. Then, the hero travels to the large city in America in pursuit of the heroine.  Ms. DuMond created the sequencing of events through the overall selection and organization of those events.  Defendants stole that sequence of events.

## VI.   <u>Conclusion.</u>

In its perfunctory Motion to Dismiss, Defendants fail to state they did not copy the Work and instead attempt to argue that the elements of the Work are unprotectable; or from Defendants' perspective -- free for the taking.  Defendants' argument is unpersuasive.  Ms. DuMond contends that the Copy was made in whole or in part with text spinning, rendering the entire Copy substantially similar due to the selection, placement and clusters of the similarities.  Due to the method of copying, the Work and the Copy are related to each other, and unlike any other two books in the world, contain unique similarities that occur in a similar order and at similar points of the works.  Because Defendants have not shown that the above identified similarities are insubstantial, as a matter of law, Ms. Dumond has sufficiently met her burden in application of the extrinsic test.

The FAC adequately alleges each of the elements of Ms. DuMond's copyright infringement claim and therefore, Defendants' Motion to Dismiss should be denied.  Alternatively, because amendment of the FAC is not futile, amendment of the FAC should be granted.

1  Dated:  March 12, 2020                JONES, DAVIS & JACKSON, PC

2

3

By:        /s/ G. Michael Jackson
4                                         G. Michael Jackson
                                          Attorneys for Pamela DuMond
5  E:\GV\N\DuMond\Opposition_MTD_O12.docx

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28